**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

08  CV  4287

| | |
|---|---|
| STEPHEN J. PHELAN, and JONATHAN and JACLYN DZEDZY, individually and on behalf of others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TITLE INSURANCE RATE SERVICE ASSOCIATION, INC., TITLE INSURANCE RATING BUREAU OF PENNSYLVANIA, STEWART INFORMATION SERVICES CORPORATION, STEWART TITLE INSURANCE COMPANY, MONROE TITLE INSURANCE CORPORATION, STEWART TITLE GUARANTY COMPANY, NATIONAL LAND TITLE INSURANCE COMPANY, FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE GROUP, INC., CHICAGO TITLE AND TRUST COMPANY, FIDELITY NATIONAL TITLE INSURANCE COMPANY, CHICAGO TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY OF NEW YORK, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, COMMONWEALTH LAND TITLE INSURANCE COMPANY OF NEW JERSEY, TRANSNATION TITLE INSURANCE COMPANY, OLD REPUBLIC INTERNATIONAL CORP., OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, and AMERICAN GUARANTY TITLE INSURANCE COMPANY, |  |
| Defendants. | |

RECEIVED MAY 06 2008 U.S.D.C. S.D.N.Y. CASHIERS

Plaintiffs Stephen J. Phelan and Jonathan and Jaclyn Dzedzy ("Plaintiffs"), by their undersigned attorneys, makes the following allegations concerning their acts and status upon actual knowledge and concerning all other matters upon information, belief, and the investigation of their counsel:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this Class action under Section 1 of the Sherman Act to enjoin Defendants' illegal price-fixing activity and to recover antitrust and related damages for illegal overcharges the Plaintiffs and the Class have paid to Defendants.

2.      Defendants are title insurance companies that conduct business throughout New York and Pennsylvania and the respective rate service organizations comprised of these title insurance companies.  These Defendants conspired, combined, and contracted to raise, maintain, fix, and stabilize the price of title insurance in New York and Pennsylvania at supracompetitive levels in violation of Section 1 of the Sherman Act, the Real Estate Settlement Practices Act of 1972, 12 U.S.C. § 2601 *et seq.* ("RESPA") and New York state law.

3.      As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class paid artificially inflated prices for title insurance policies that exceeded the amount Plaintiffs and Class members would have paid if the price for title insurance had been determined by a competitive market.

## JURISDICTION AND VENUE

4.      Plaintiffs brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to recover damages, attorneys' fees, and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

5.      The Court has personal jurisdiction over this lawsuit since Defendants transact business, maintain offices or are found within the Southern District of New York and the interstate commerce described hereinafter is carried on, in part, within the Southern District of New York and the conspiratorial acts herein alleged were carried on, in part, in the Southern District of New York.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).

7.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), because at least one of the Defendants resides in this judicial district, and the transactions and occurrences giving rise to Plaintiffs' cause of action took place, at least in part, in this judicial district.

## **PARTIES**

8.      Plaintiff Stephen J. Phelan is a resident and citizen of the State of New York.  On May 1, 2006, Mr. Phelan purchased title insurance from Defendant Chicago Title Insurance Company in connection with a purchase of property in Albany, New York.  The price Mr. Phelan paid for title insurance was artificially high because of Defendants' unlawful price-fixing scheme.

9.      Plaintiffs Jonathan and Jaclyn Dzedzy are residents and citizens of the Commonwealth of Pennsylvania.  Mr. and Mrs. Dzedy purchased title insurance from First American Title Insurance Company in connection with their purchase of property in West Norriton, Pennsylvania.  The price Mr. and Mrs. Dzedy paid for title insurance was artificially high because of Defendants' unlawful price-fixing scheme.

10.      Defendant Title Insurance Rate Service Association Incorporated ("TIRSA") is a voluntary association of title insurers with headquarters in New York City, New York.  TIRSA

operates as a rate service organization licensed by New York under Article 23 of the Insurance Law.  TIRSA collects revenue and cost information from Defendants and TIRSA's other members, and annually submits this information in aggregate form along with collectively set title insurance rates to the New York Insurance Department ("Insurance Department"). Under this rate setting regime, Defendants have charged identical and collectively-fixed title insurance rates to consumers in New York.  TIRSA is comprised of all title insurance companies licensed to do business in New York, but the organization was founded and continues to be controlled by the "Big Four" title insurance companies: Stewart Information Services Corporation, Fidelity National Financial, Inc., First American Corporation, and LandAmerica Financial Group, Inc., Together, these "Big Four" companies account for approximately 92% of the title premiums consumers pay in New York, which in 2006 amounted to an estimated $1.2 billion.

11.     Defendant Title Insurance Rating Bureau of Pennsylvania ("TIRBOP") is a voluntary association of title insurers licensed by the Pennsylvania Insurance Department pursuant to Section 741 of The Insurance Company Law of 1921, 40 P.S. §910-41.  TIRBOP maintains its offices in Wayne, Pennsylvania.  TIRBOP compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the Pennsylvania Insurance Department.  TIRBOP also prepares and distributes a manual which sets forth title rates to be charged and rules to be followed by TIRBOP's members.  Under this rate setting regime, Defendants have charged identical and collectively-fixed title insurance rates to consumers in Pennsylvania.  TIRBOP's membership is comprised of defendant insurers and other title insurers that are licensed to issue policies in Pennsylvania.  Currently Stewart Information Services Corporation, Fidelity National Financial,

Inc., First American Corporation, and LandAmerica Financial Group, Inc, collectively represent 16 of TIRBOP's 26 members.

12.    Defendant Stewart Information Services Corporation ("Stewart") is a Delaware corporation headquartered in Houston, Texas.  Stewart is one of the "Big Four" title insurance companies.  Through its subsidiaries, including Defendants Stewart Title Insurance Company, Monroe Title Insurance Corporation, Stewart Title Guaranty Company and National Land Title Insurance, Stewart sells title insurance to purchasers of commercial and residential real estate throughout the United States, including New York and Pennsylvania. Nationally, Stewart accounts for approximately 12% of title insurance premiums, which in 2006 amounted to roughly $2 billion, Stewart accounts for approximately 14% of the title insurance premiums consumers pay in New York, which in 2006 amounted to an estimated $168 million.

13.    Defendants Stewart Title Insurance Company ("Stewart Title") and Monroe Title Insurance Corporation ("Monroe Title") are wholly owned and controlled by Stewart. Stewart Title and Monroe Title are engaged in the conduct alleged herein with the approval and assent of Stewart.  Since TIRSA's inception, Stewart Title and Monroe have sold, and continue to sell, title insurance at artificially high rates to consumers of residential and commercial real estate in New York.

14.    Defendants Stewart Title Guaranty Company ("Stewart Guaranty") and National Land Title Insurance Company ("National Land") are wholly owned and controlled by Stewart. Stewart Guaranty and National Land are engaged in the conduct alleged herein with the approval and assent of Stewart.  Since TIRBOP's inception, Stewart Guaranty and National Land have sold, and continue to sell, title insurance at artificially high rates to consumers of residential and commercial real estate in Pennsylvania.

15.     Defendant Fidelity National Financial, Inc. ("Fidelity") is a Delaware corporation headquartered in Jacksonville, Florida.  Fidelity is one of the "Big Four" title insurance companies.  Through a collection of wholly-owned subsidiaries, including Defendants Fidelity National Title Group, Inc., Chicago Title and Trust Company, Fidelity National Title Insurance Company, Chicago Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida and their affiliates, Fidelity is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York and Pennsylvania.  Nationally, Fidelity accounts for approximately 27% of title insurance premiums, resulting in revenues of approximately $4.6 billion in 2006. Fidelity accounts for approximately 31% of the title insurance premiums consumers pay in New York, which in 2006 amounted to an estimated $361 million.

16.     Defendants Fidelity National Title Insurance Company ("Fidelity National Title"), Chicago Title Insurance Company ("Chicago Title"), and Ticor Title Insurance Company ("Ticor Title") are wholly-owned Fidelity subsidiaries that sold and continue to sell title insurance at artificially high rates to consumers of residential and commercial real estate in New York, Pennsylvania and throughout the United States.  Defendants Fidelity National Title, Chicago Title, Ticor Title and Ticor Title Insurance Company of Florida ("Ticor Florida") are members of TIRSA and have charged rates in New York that TIRSA collectively set. Defendants Fidelity National Title, Chicago Title, Ticor Title and Ticor Florida  are also members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.  Defendants Fidelity National Title, Chicago Title, Ticor Title and Ticor Florida engaged in this conduct with the approval and assent of Fidelity.

17.     Defendant First American Corporation ("First American") is a California corporation with headquarters in Santa Ana, California.  First American is one of the "Big Four" title insurance companies.  Through a collection of wholly-owned subsidiaries, including Defendants First American Title Insurance Company of New York, United General Title Insurance Company, First American Title Insurance Company, Censtar Title Insurance Company, T.A. Title Insurance Company and their affiliates, First American is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York and Pennsylvania.  Nationally, First American accounts for approximately 29% of title insurance premiums, resulting in revenues of approximately $4.8 billion in 2006.  First American accounts for approximately 25% of the title insurance premiums consumers pay in New York which amounted to about $290 million in 2006.

18.     Defendants First American Title Insurance Company of New York ("First American New York"), United General Title Insurance Company ("United General Title"), First American Title Insurance Company ("First American Title"), Censtar Title Insurance Company ("Censtar Title"), and T.A. Title Insurance Company ("T.A. Title") are wholly-owned First American subsidiaries that sold and continue to sell title insurance at artificially high rates to consumers of residential and commercial real estate in New York, Pennsylvania and throughout the United States.  Defendants First American New York and United General Title are members of TIRSA and have charged rates in New York that TIRSA collectively sets.  Defendants First American Title, Censtar, United General Title and T.A. Title are members of TIRBOP and have charged insurance rates in Pennsylvania that TIRBOP collectively sets.  Defendants First American New York, United General Title, First American Title, Censtar, United General Title and T.A. Title engaged in this conduct with the approval and assent of First American.

19.     Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia corporation with headquarters in Glen Allen, Virginia.  LandAmerica is one of the "Big Four" title insurance companies.  LandAmerica, through a collection of subsidiaries, including Defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation, Commonwealth Land Title Insurance Company of New Jersey, Transnation Title Insurance Company and their affiliates, sell title insurance to purchasers of commercial and residential real estate throughout the United States, including New York and Pennsylvania. Nationally, Land America accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  LandAmerica accounts for approximately 22% of title insurance premiums consumers pay in New York, which in 2006 amounted to an estimated $258 million.

20.     Defendants Commonwealth Land Title Insurance Company ("Commonwealth Land Title"), Lawyers Title Insurance Corporation ("Lawyers Title"), Commonwealth Land Title Insurance Company of New Jersey ("NJ Commonwealth"), and Transnation Title Insurance Company ("Transnation"), are wholly-owned LandAmerica subsidiaries.  Commonwealth Land Title and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.  Commonwealth Land Title, NJ Commonwealth, Lawyers Title and Transnation are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.   Commonwealth Land Title, Lawyers Title sold and NJ Commonwealth, and Transnation continue to sell title insurance at artificially high rates to consumers of residential and commercial real estate in New York and Pennsylvania.  Commonwealth Land Title, Lawyers Title sold and NJ Commonwealth, and Transnation engaged in this conduct with the approval and assent of LandAmerica.

21.     Old Republic International Corporation ("Old Republic Group") is a Delaware corporation with headquarters in Chicago, Illinois.  Old Republic Group, through a collection of subsidiaries, including Defendants Old Republic National Title Insurance Company and American Guaranty Title Insurance Company and their affiliates, sell title insurance to purchasers of commercial and residential real estate throughout the United States, including New York and Pennsylvania.  Nationally, Old Republic Group accounts for approximately 6 percent of title premiums, which in 2006 amounted to roughly $1 billion.

22.     Defendants Old Republic National Title Insurance Company ("Old Republic Title") and American Guaranty Title Insurance Company ("American Guaranty Title"), are wholly-owned Old Republic Group.  Old Republic Title is a member of TIRSA and charge title insurance rates in New York that TIRSA collectively sets.  Old Republic Title and American Guaranty Title are members of TIRBOP and have charged title insurance rates in Pennsylvania that TIRBOP collectively sets.   Old Republic Title and American Guaranty Title continue to sell title insurance at artificially high rates to consumers of residential and commercial real estate in New York and Pennsylvania.  Old Republic Title and American Guaranty Title engaged in this conduct with the approval and assent of Old Republic Group.

## CO-CONSPIRATORS AND AGENCY

23.     Various other persons, firms, corporations and entities, whose identities are presently unknown to Plaintiffs participated as co-conspirators of Defendants in the conspiracy alleged here, and acted, made statements, and aided or assisted in carrying out the purposes of the conspiracy.  When the identities of these co-conspirators become known, Plaintiffs will seek leave to add them as Defendants in this litigation.

24.     Various other persons, firms, corporations and entities, whose identities are presently unknown to Plaintiffs, participated as agents of Defendants in the conspiracy alleged

here, and acted, made statements, and aided or assisted in carrying out the purposes of the conspiracy. When the identities of these agents become known, Plaintiffs will seek leave to add them as Defendants in this litigation.

25.     Each of the Defendants acted as the agent of, or in a joint venture with, each of the other Defendants and, in doing the acts alleged here, was acting within the course and scope of such agency.

26.     The acts charged in this Complaint were authorized, ordered, ratified, or committed by Defendants' officers, agents, employees, or representatives while they were actively engaged in the management of Defendants' business and were ratified by each of the other Defendants.

27.     Defendants are liable for acts done in furtherance of the alleged conspiracy by companies they acquired through merger or acquisition.

<u>**FACTUAL ALLEGATIONS**</u>

A.     <u>**The Title Insurance Industry**</u>

28.     Title insurance is required by lenders for most residential and commercial real estate transactions in New York and Pennsylvania. Title insurance is one of the most costly items associated with the closing of a real estate transaction. The purchaser pays a title insurance company to confirm that the seller will transfer a clear title to the property at the close of escrow and to insure against potential losses if defects in the title are discovered after the sale.

29.     Although the consumer pays for the title insurance, consumers rarely "shop around" for a policy. Title insurance is a purchased by paying a one-time premium. Unlike many other forms of insurance like homeowners' or auto insurance, the average consumer is unlikely to have an existing or ongoing relationship with a title insurance agent. The purchase of title insurance is wrapped into the myriad of events and costs that accompany "closing" on a

property. The consumer usually relies on a real estate intermediary, such as a real estate agent, lawyer, lender or mortgage broker, to select or recommend a particular title insurance agent or title insurance company. Consequently, for most purchasers, the cost of title insurance is largely overlooked and seldom, if ever, challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. There is neither comparison of available prices, nor negotiation of price.

30.      This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, title insurance is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions, and are in no position to question the price.

31.      The most effective way for a particular title insurer to get business is to encourage those making the purchasing decisions - the lawyers, brokers, lenders - to steer business to that insurer. The best way to so motivate these third-party representatives is not through lower prices (that they are not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing (which allows for this third-party consideration), not lower pricing, that provides the best way for title insurers increase their business.

32.      The title insurance agent who sells the policy to the consumer may be independent or, as is often the case, may be associated with a particular title insurance company. Either way, the agent is responsible for the title search and examination performed before the title insurance company issues a policy.

33.     The title insurance industry maintains electronic databases that make the title search and examination efficient, inexpensive and accurate.  Title insurance agents increasingly outsource this task to others, including overseas contractors, to reduce costs even more.  As a result, a very small percentage of title insurance premiums go toward generating policies.  The industry magazine, The Title Report, estimated in 2003 that the average cost for the labor and administration of a title insurance policy was $262, and that commonly used transaction management systems could reduce that expense to less than $100 per policy.

34.     Due in part to the increased accuracy of title examinations, actual defects in title are rarely discovered after a sale.  A proper search often uncovers defects before the title insurance policy takes effect, allowing those defects to be excluded from the policy's coverage.  When problems do arise, they may usually be resolved at a nominal cost.  The payout rate for title insurance claims in recent years has been about 5% of premium dollars.  This is in sharp contrast to other types of insurance, such as homeowners' or auto insurance, where the payout rate is about 80% of premium dollars on claims.

35.     Despite low claims payouts and decreasing administrative costs, title insurance rates have increased substantially over recent years.  Consumers in New York and Pennsylvania pay artificially high title insurance premiums because the New York and Pennsylvania title insurance markets operate in a collusive manner.

**B.     New York's Inflated Title Insurance Prices**

36.     Under New York State Insurance Law, title insurance rates may be collectively set through a rate-setting organization comprised of the state's title insurers.  It was under the auspices of this law that the Defendant title insurance companies formed TIRSA in 1991.

37.     The Insurance Department is charged with reviewing the rates Defendants collectively set (through TIRSA).  But the insurance companies have undermined the Insurance

Department's ability to carry out this charge by basing the rates primarily on costs that the Department has no authority to review.

38.     There is little variation in the cost of a title insurance policy in New York. TIRSA's collectively-fixed rates for title insurance are based on a percentage of the total value of the property that is being insured.  For residential properties, this collectively-fixed price ranges from approximately $1,200 (for a $250,000 property) to $3,700 (for a $1 million property). These prices are significantly higher for more expensive homes and commercial properties, and can cost consumers tens of thousands of dollars.  TIRSA's fixed rate calculation includes two cost components.

39.     The first cost component is the risk associated with issuing the title policy.  This risk component covers the risk the title insurer bears for any undiscovered defects in the title. There is little risk associated with title insurance, because it covers past events that cause defects in title.  Unlike other types of insurance policies, title insurers can search existing records before issuing the policy to significantly reduce – or even eliminate – potential risks by excluding them from the policy's coverage.

40.     The second cost component is the "agency commission" paid to title agents.  A small portion of the agency commission is made up by the cost of title searches and examinations.  A much larger portion of the agency commission is used to provide financial incentives to title agents.  The financial incentives paid to title agents are unrelated to the value of the title insurance policies to consumers and take the form of "kickbacks" and other inducements.  Title agents then pass the financial incentives on to real estate intermediaries like lenders, mortgage brokers and real estate agents in return for funneling business their way.

Because of the nature of these financial incentives, the Insurance Department cannot effectively review them.

41.     The Insurance Department has no regulatory authority over title agents and their activities.  Because Defendants outsource the agency commission costs to title agents, they avoid having to give the Insurance Department a detailed accounting of those costs.  New York law does not allow costs to be included in the agency commissions component that are unrelated to actual expenses incurred in providing title insurance. Because the Insurance Department lacks the authority to review any agency commission payments, it cannot enforce that law.

42.     The agency commissions comprise nearly 85% of the total rate that TIRSA calculates.  Defendants' scheme allows them to collectively fix title insurance costs at an artificially high rate that incorporates the illegal kickbacks and other payments made to title agents.

C.     **Pennsylvania's Inflated Title Insurance Process**

43.     Similarly, in Pennsylvania Defendants collectively fix their prices through TIRBOP, a rate-setting organization like TISRA.  This is authorized by Section 741 of the Insurance Company Law of 1921, 40 P.S. §910-41. Just as in New York, TIRBOP's rate calculations consist of two principal cost components: (1) the risk associated with issuing the title policy; and (2) the "agency commissions" paid to title agents.

44.     Just as in New York, the risk component covers the risk the title insurer bears for any undiscovered defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer.  That is because title insurance protects against *prior* events that cause defects in title.  With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage.  Consequently, the claim payouts on title insurance policies in Pennsylvania

amount to less than 2 percent of total premiums collected. This is very different from property coverage (such as auto and home insurance) - which protects against *future* occurrences over which the insurer has little or no control - where the average claim payout amounts to about 80 percent of total premiums.

45.    The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically outsource this task to title agents.

46.    The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

47.    TIRBOP publishes its final calculated title rates in the Manual of Title Insurance Rating Bureau of Pennsylvania. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with the agency commissions are entirely unrelated to the value of the property. Agency kickbacks and enticements have little to do with producing a particular title policy and provide no value - proportional to property value or otherwise - to the consumer. Even search and exam costs are unrelated to property value. They

instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

48.     TIRBOP merely submits an aggregated figure that is supposed to represent total agency commission costs.  Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effectively "hide" the costs basis for the artificially high and collectively fixed title insurance premiums from the regulatory scrutiny.

49.     In Pennsylvania, TIBROP's collectively fixed rates for title insurance are based upon a percentage of the total value of the property being insured.  For residential properties, this price ranges from about $420 (for a $30,000 property) to $4,733 (for a $2 million property).  For more expensive homes and commercial properties, these prices are significantly higher and can reach tens of thousands of dollars.  These prices are among some of the highest in rates in the United States.

**D.      The Absence of Effective State Oversight and Regulation**

50.     Before TIRSA, the New York Board of Title Underwriters served as the title insurance rate setting body in New York.  The New York Board, like similar bureaus in many other states, was disbanded in the mid 1980s in the wake of a Federal Trade Commission challenge to the collective rate-setting activity of many of these associations.  The United States Supreme Court held, in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), that the associations' rate-setting activities constitute *per se* illegal price fixing unless the rate-setting is subjected to active supervision by the states.

51.     In *Ticor*, the FTC focused its challenge on agency commissions, The FTC contended that the respective state insurance departments merely rubber-stamped this portion of

the collectively set rates without independently analyzing or reviewing whether the costs were justified or reasonable. The Supreme Court agreed with the FTC that this kind of limited oversight was insufficient. To avoid liability for price-fixing, state insurance departments must "exercise[] sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

52.    After *Ticor*, the "Big Four" companies, and other New York insurers, established TIRSA, while the "Big Four" and other Pennsylvania insurers established TIRBOP and used these respective organizations to implement a rate-setting scheme while evading the state oversight the Supreme Court mandated in *Ticor*. Since then, Defendants have calculated and agreed upon aggregate revenue and cost data that includes both risk and agency commission costs. TIRSA and TIRBOP submits this aggregate data to their respective state Insurance Departments with Defendants' collectively-set insurance rates, but neither the data nor Defendants' set premiums are meaningfully reviewed or approved by either the New York or Pennsylvania Insurance Department.

53.    In November 2006, the Insurance Department – for the first time in 15 years – held public hearings questioning TIRSA's failure to provide the details of agency commission costs. In this process, the Insurance Department acknowledged that the title insurance Defendants set premium rates through TIRSA that the Department did not meaningfully review.

54.    The Insurance Department pointed to the outsourcing of commission costs as the reason it cannot effectively evaluate title insurance rates. At the hearings, Mark Presser, the Assistant Deputy Superintendent of the Insurance Department ("Presser"), questioned David

Skidikman, the Executive Director of TIRSA and an executive at LandAmerica ("Skidikman"),

about the commission costs:

> Q: At the same time you've also testified that your members really don't know what the title agents are doing with the money that they're getting, in other words, they give them 85 percent and as far as they know they have no input or knowledge of what's being done with the money, I just want to make sure, is that correct?
>
> A: I have no way of knowing ...what [the title agents'] expenses are, what their overheads are, what they pay in salaries, what they pay in administrative costs, what they pay in rent and what they pay in every other aspect of their overhead, I have no way of knowing that.

* * *

> Q: I'm just getting at the point that a large portion of the data represents revenue and expenses that are outside the control of the [title insurance companies] and outside of the control of TIRSA any you have no specific knowledge as to how those dollars are being expended, as you just said?
>
> A: That's correct.

* * *

> Q: If you don't look at the expenses of the agents, if you don't really do an analysis of their costs . . . how do you know the profit they're making is reasonable . . . if you or no one else delves into what they're actually spending the 85 percent on?
>
> A: That's a good question...

55.     In response to questioning by Presser, Skidikman admitted that TIRSA did not

even know how much title agents spend to conduct a title search:

> Q: What are the actual costs to title insurers to the agents to do the necessary searches and all the other things that they need in order to do in connection with a title search?
>
> A: We do not get the agents' statistics because that is between the [insurer] and the agent.

56.     In response to questioning by Joseph Risi, Deputy Superintendent and General Counsel of the Insurance Department, Skidikman acknowledged that the Insurance Department could not evaluate TIRSA's rates without access to a cost breakdown that TIRSA does not collect from title agents:

> Q: It seems to me that looking at costs, since this piece is such a significant portion of what the rate is and that's part of what goes into the rate, it seems like that is really an area of inquiry that we should be making to understand what goes into that cost factor. I think that's an area we need to explore. I don't know how to do that. It seems like it's a significant piece and it doesn't seem like anyone is really telling us what goes into that. Would you agree that that's something we need to explore as part of the rates?
>
> A: Now, TIRSA, as an organization, has no control or no dealing with the agents, we deal only with the [insurers], so we have no way of knowing what the cost basis is certainly for the agents
> ....

57.     In April 2007, the federal government released findings made by the Government Accountability Office ("GAO") after studying the industry conditions of several states, including New York. The GAO concluded that the title insurance industry must be subject to greater state regulation, stating: "state regulators have not collected the type of data, primarily on title agents' costs and operations, needed to analyze premium prices and underlying costs."

### E.     Defendants' Unlawful Profits

58.     The title insurance industry has historically been very successful at lobbying for legislation to bar title insurance issuers from selling other forms of insurance, and bar companies that do not issue title insurance policies from writing title insurance. As a result, major insurance companies like State Farm or Allstate have been effectively barred from selling title insurance. Having eliminated open market competition for title insurance rates, the "Big Four" have come to dominate the title insurance market, as shown by their market dominance. For example,

Defendants receive about 92% of all title insurance premiums paid by New York consumers. Similarly, Defendants controlled in excess of 90% of the market for title insurance in Pennsylvania, with sales in excess of $600 million in Pennsylvania during 2003.

59.     Defendants have also found a way to effectively circumvent the intended government regulation of their rate structure.  For example, the New York Insurance Department has set the profit margin for title insurance at 5%.  However, by packing rate calculations with unreviewable agency commission costs, Defendants have been able to set artificially high title premiums and secure title profits far in excess of 5%.

60.     In its 2005 SEC Form 10-K, Defendant Stewart listed is customers not as homebuyers, but as "attorneys, builders, developers, lenders, and real estate brokers."  This exemplifies how the market for title insurance is driven by the payment of financial incentives through title insurance agents rather than by any price pressure from consumers.

61.     The State Attorney General of New York ("Attorney General") has independently confirmed that Defendants have reaped excessive profits through their scheme.  The Attorney General found that Defendants claim to use fifteen cents of each dollar of insurance premiums to cover risk of loss, yet only three cents of each dollar are actually paid out in claims.  Of the eighty-five cents that supposedly covers agency commissions, only 8-11% is spent on costs incurred by title agents in producing the policies.  Thus, Defendants rates generate profits far beyond the Insurance Department's limit.

62.     The Attorney General's investigation further revealed that financial incentives, including kickbacks paid to intermediaries to secure more business, were largely responsible for the inflated title insurance rates.  The Attorney General concluded that "all this money paid to the title agents by the title insurance companies is a referral fee in violation of New York's Anti-

kickback Law." For example, one title agency's financial statements revealed that more than $1 million accounted for as "agency commissions" was spent on items identified as "Christmas," "automobile expenses," "political contributions," "promotional expenses," and "travel and entertainment."

63.    Even participants in the scheme admit that inflated premiums and kickbacks are widespread. One agent who worked with several Defendants admits there is a "rampant culture of illegal kickbacks." A title agent for Chicago Title admitted that "the title companies and some agents use the fees as a marketing tool to get business. Long gone are the days of a lunch and a round of golf. Today it is [a kickback of up to] 70% of a title premium for little or no work being performed."

## ACTIVE CONCEALMENT

64.    At all relevant times, Defendants and their co-conspirators conducted their conspiracy in secret, concealing the true nature of their unlawful conduct and acts in furtherance thereof, and hiding their activities from detection through various means and methods.

65.    Defendants succeeded in hiding the existence of their illegal scheme by publicly offering pretextual and false justifications regarding the rates they set for title insurance.

66.    Plaintiffs did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until November 2006, when the New York Insurance Department held public hearings to investigate Defendants' anticompetitive practices.

67.    As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations have been tolled.

## TRADE AND COMMERCE

68.     During all or part of the period in suit, Defendants and their co-conspirators were sellers of title insurance in New York State and the Commonwealth of Pennsylvania.

69.     During the period in suit, Defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.

70.     During the period in suit, Class members from locations outside New York State and the Commonwealth of Pennsylvania purchased commercial or residential property and title insurance within New York State and the Commonwealth of Pennsylvania.

71.     During the period in suit, Defendants were the major sellers of title insurance in New York State, controlling more than 90% of the market for title insurance in New York State and the Commonwealth of Pennsylvania.  Total sales of title insurance by Defendants exceeded $1.2 billion on an annual basis in New York State throughout the period in suit and more than $600 million on an annual basis in the Commonwealth of Pennsylvania during the same period.

72.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## ANTICOMPETITIVE CONDUCT

73.     Defendants are competitors in the sale of title insurance to consumers in New York and Pennsylvania.  Through TIRSA and TIRBOP, these title insurers agreed and engaged in concerted efforts to: collectively set and charge uniform and supracompetitive rates for title insurance in New York and Pennsylvania; include agency commission costs in their calculated rates; embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance; and hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the respective state  Insurance Departments have no ability or authority to regulate.

74.     In the absence of proper regulatory authority and oversight, Defendants' conduct constituted a horizontal agreement to fix the form, structure, and price of title insurance in New York and Pennsylvania – and is a *per se* violation of Section 1 of the Sherman Act.

75.     Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through TIRSA's and TIRBOP's submissions of supposed cost and revenue information to their respective state Insurance Departments, and through its periodic submissions of rate changes to the Insurance Departments.

76.     Through their collective price-fixing and manipulation of the regulatory process, Defendants have harmed competition by charging consumers supracompetitive prices for title insurance in New York and Pennsylvania.

77.     New York and Pennsylvania's title insurance rates are among the highest in the country.  According to rate comparisons made by Bankrate.com, one of the country's leading aggregators of financial rate information, New York title rates (based on insuring a property with a $200,000 mortgage) are roughly 67% higher than the national average.  New York consumers pay between 70% and 110% more for title insurance than consumers in many nearby states, including: Delaware, Maine, Maryland, Massachusetts, New Hampshire, Vermont, and Washington, D.C.

78.     Defendant First American's own rate comparisons further confirm the vastly inflated title rates in New York compared to the rest of the country.  First American's calculations (based on a $200,000 mortgage) show that New York title rates are roughly 45% higher than the national average.  First American's calculations show that this gap is even greater – approaching or exceeding 100% - as compared to the rates for many neighboring states, including: Maine, Maryland, Massachusetts, New Hampshire, and Vermont.

79.     Absent Defendants' illegal conduct, New York and Pennsylvania consumers would have paid significantly less for title insurance.  These prices would have been more in line with the significantly lower prices charged by title insurers in states where the challenged price-fixing activity has not occurred.

## CLASS ACTION ALLEGATIONS

80.     Plaintiffs bring this action on behalf of themselves and as a Class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).  Plaintiffs seeks to certify the following two classes:

A.     The Antitrust Class:

**All individuals and entities who purchased title insurance for properties in New York or Pennsylvania directly from Defendants, their subsidiaries, agents, and/or affiliates (the "Antitrust Class") between 1991 and the present (the "Class Period").**

B.     The RESPA Class:

**All individuals and entities who purchased title insurance for properties in New York or Pennsylvania directly from Defendants, their subsidiaries, agents, and/or affiliates during the Class Period and who secured such insurance in connection with a closing on a "federally related mortgage loan" as that term is defined in 12 U.S.C. § 2602(1) (the "RESPA Class").**

81.     Specifically excluded from the Antitrust Class and the RESPA Class are Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

82.     The Antitrust Class and the RESPA Class are referred to herein individually and collectively as the "Class."

83.     This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Fed. R. Civ. P. 23.

84.     Plaintiffs and all other members of the Antitrust Class were injured in a similar way – they each paid supracompetitive prices for title insurance in New York and Pennsylvania.

85.     Plaintiffs and all other members of the RESPA Class were injured in a similar way – they each paid fees for services which were either "other than for services actually performed" or were for "unearned fees" as those terms are defined in 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

86.     Members of the Class are so numerous that their individual joinder is impracticable.  It is estimated that the Class consists of thousands of members.

87.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common questions include:

a.      Whether Defendants engaged in contract, combination or conspiracy among themselves and/or their co-conspirators to raise, fix, and maintain the prices of title insurance sold in New York and Pennsylvania;

b.      The identities of the co-conspirators;

c.      The duration of the conspiracy and nature and character of the acts done in furtherance of the conspiracy;

d.      Whether the conspiracy violated Section 1 of the Sherman Act;

e.      Whether Defendants actively concealed the contract, combination or conspiracy from Plaintiffs and other Class members;

f.      Whether Defendants' conduct violated RESPA;

g.     Whether Defendants' conduct violated Section 349 of New York's General Business Law;

h.     Whether the conduct of Defendants and their co-conspirators caused prices of title insurance premiums to be artificially inflated to non-competitive levels;

i.     Whether Plaintiffs and other members of the Class were injured by conduct of Defendants and their co-conspirators and, if so, the appropriate Class-wide measure of damages and appropriate injunctive relief; and

j.     Whether Defendants were unjustly enriched as a consequence of their unlawful conduct.

88.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs bought title insurance from two of the Defendants and, like all Class members, were damaged by the wrongful conduct of Defendants and their co-conspirators, and seeks relief common to the Class.

89.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex Class action litigation, and intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

90.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this case as a Class action.

91.    In the alternative, the Class may be certified because:

a.     the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to

individual Class members and would establish incompatible standards of conduct for Defendants;

b.    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede the ability of other Class members to protect their interests; and

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, making final and injunctive relief with respect to the members of the Class as a whole an appropriate form of relief.

92.    Plaintiffs reserve the right to expand, modify, or alter the Class definition in response to information learned during discovery.

## CLAIMS FOR RELIEF

## COUNT I

**Violation of Section 1 of the Sherman Act
(Unlawful Horizontal Price Fixing)
Against All Defendants**

93.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

94.    Beginning at a time presently unknown to Plaintiffs, but at least as early as the start of the Class Period, Defendants and their co-conspirators have entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially set, raise, fix, and/or maintain prices for title insurance in New York and Pennsylvania. This contract, combination and conspiracy is *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators actually did those things they combined and conspired to do, including:

a.    Collectively setting, fixing, raising, and maintaining artificially inflated title insurance rates;

b.  Including within their collectively-fixed rates the cost of commissions, payoffs, kickbacks, and other charges paid to title agents that were unrelated to the issuance of title insurance;

c.  Hiding these supposed costs from regulatory scrutiny by funneling them through title agents; and

d.  Evading regulatory oversight by failing to disclose the payment of payoffs, kickbacks and other charges unrelated to the issuance of title insurance.

96.  Defendants' contract, combination or conspiracy has caused substantial anti-competitive effects in the title insurance market by causing Plaintiffs and other purchasers of title insurance in New York and Pennsylvania to pay significantly more for title insurance than they would have in the absence of Defendants' wrongful conduct and/or illegal activity.

97.  As a direct and proximate result of Defendants' wrongful conduct and/or illegal activity, and the violations of Section 1 of the Sherman Act as herein alleged, Plaintiffs and the Class have been injured in their business and property in an amount to be determined at trial.

98.  Such violations and the effects thereof are continuing and will continue unless the Court enjoins Defendants from continuing their conspiracy in restraint of trade.

## COUNT II

### -- Against all Defendants --

### RESPA - Splitting of Undisclosed Fees For Services Not Rendered

99.  Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

100.  Plaintiffs and each class member of the RESPA Class are "person[s]" as that term is defined in 12 U.S.C. § 2602(5).

101.    Plaintiffs and each class member of the RESPA Class paid title insurance premiums in connection with their closing on "federally related mortgage loans" as that term is defined in 12 U.S.C. § 2602(1).

102.    Defendants provided "settlement services" to Plaintiffs and each member of the RESPA Class as that phrase is defined in 12 U.S.C. § 2602(3) and applicable regulations promulgated thereunder.

103.    Section 2607(b) of Title 12 of the United States Code states, in pertinent part, that "no person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 24 C.F.R. § 3500.14(c) construes 12 U.S.C. § 2607(b) to also prohibit the charging and collecting of an "unearned fee."

104.    As alleged herein, Defendants imposed fees on Plaintiffs and the members of the RESPA class for settlement services that were split with unknown persons and either unearned or not provided which are prohibited by RESPA and other federal laws and regulations. The vast majority of the agency commissions identified herein which were *sub silentio* imposed by Defendants were in excess of the reasonable value of services provided.

105.    Defendants' acts, practices and conduct constitute *per se* violations of RESPA. Alternatively, even if not *per se* violations, Defendants acts, practices and conduct violated RESPA.

106.    Plaintiffs and each class member of the RESPA Class has been injured as a result of Defendants' violations of 12 U.S.C. §§ 2607.

107.    Plaintiffs and each class member of the RESPA Class is entitled to pursue an action and a class action against Defendants pursuant to 12 U.S.C. §§ 2607(d) to redress Defendants' violations of RESPA.

**COUNT III**

**-- Against all Defendants --**

**Action for Damages Under New York Gen. Bus. Law § 349 on behalf of New York Residents**

108.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

109.    New York General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

110.    New York General Business Law § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater . . . The court may award reasonable attorney's fees to a prevailing plaintiff."

111.    By virtue of the patterns of deceptive conduct alleged above, Defendants engaged in consumer-oriented deceptive acts or practices within the meaning of New York General Business Law § 349.  Defendants' deceptive conduct resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' deceptive conduct resulted in inflated prices for title insurance policies.

112.    Plaintiffs and the Class acted as consumers in their purchases of Defendants' title insurance policies.  Defendants have vastly greater expertise than its customers with regard to the terms and pricing of the title insurance policies, and vastly greater influence over the terms of the policies.

113.    Plaintiffs and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial.  Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs and the Class do not seek in this action to have those damages trebled pursuant to the New York General Business Law § 349 (h).

114.    Defendants' conduct, as described above, entitles Plaintiffs and the Class to an award of attorneys' fees pursuant to New York General Business Law § 349 (h).

## COUNT IV

## UNJUST ENRICHMENT

115.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

116.    Defendants benefited from their unlawful acts through overpayments for title insurance policies by Plaintiffs and the Class.  It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and the Class and retained by Defendants.

117.    Plaintiffs and the Class are entitled to have returned to each of them the amount of such overpayments as damages or restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     That this action be certified and maintained as a Class action under Rule 23(a),(b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     That Plaintiffs be appointed as Class representatives for the Class and Plaintiffs' counsel be appointed as lead counsel for the Class;

C.     That this Court declare, adjudge, and decree that the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

D.     That this Court declare, adjudge, and decree that Defendants have violated RESPA;

E.     That this Court declare, adjudge, and decree that Defendants have violated Section 349 of New York's General Business Law;

F.     That the Court award Plaintiffs and members of the Antitrust Class damages, as provided by federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Antitrust Class be entered against Defendants in an amount to be trebled in accordance with such laws;

G.     That the Court award Plaintiffs and members of the RESPA Class "three times the amount of any charge paid" for the unearned settlement services referenced herein, plus attorneys' fees and costs. 12 U.S.C. § 2607(d);

H.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner, continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other

contract, conspiracy or combination having similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

      I.     That the Court award Plaintiffs and members of the Class pre-and post-judgment interest, and that the interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

      J.     That the Court award Plaintiffs and members of the Class their costs of this suit, including expert costs and reasonable attorneys' fees as provided by law; and

      K.     That the Court award Plaintiffs and members of the Class such other, further and different relief as the Court deems just and proper under the circumstances.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury of all issues so triable.

Dated: May 6, 2008                           Respectfully submitted,

                                     **FARUQI & FARUQI, LLP**

                                     By: _____
                                         Antonio Vozzolo (AV-8773)
                                    Antonio Vozzolo (AV-8773)
                                    369 Lexington Avenue, 10th Floor
                                    New York, NY  10017
                                    Telephone: (212) 983-9330
                                    Facsimile: (212) 983-9331
                                    avozzolo@faruqilaw.com

                                     **FARUQI & FARUQI, LLP**
                                    Kendall S. Zylstra
                                    Stephen E. Connolly
                                    2600 Philmont Avenue, Suite 324
                                    Huntingdon Valley, PA  19006
                                    Telephone: (215) 914-2460
                                    Facsimile: (215) 914-2462
                                    kzylstra@faruqilaw.com
                                    sconnolly@faruqilaw.com

**SALTZ MONGELUZZI BARRETT &
BENDESKY, P.C.**
David J. Cohen
Simon Paris
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA  19103
Telephone: (215) 496-8282
Facsimile: (215) 496-0999
dcohen@smbbcom
sparis@smbb.com

*Attorneys for Plaintiffs*